853 F.2d 1298
 9 Employee Benefits Ca 2657
 Dennis E. WHITFIELD, Deputy Secretary of the United States
Department of Labor, Plaintiff-Appellee,
v.
Oscar C. LINDEMANN and Henry Klepak, Defendants-Appellants,
Theodore Shanbaum, the Estate of Ellis Carp and Lee Optical,
Inc., Defendants.
 No. 87-1324.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 9, 1988.
Rehearing Denied Oct. 14, 1988.
 
 G. Scott Damuth, Dallas, Tex., for Klepak.
 Ron Edmondson, Corsicana, Tex., for Lindemann.
 William W. Taylor, Leslie C. Perlman, U.S. Dept. of Labor, Office of the Sol., Plans Benefits Sec. Div., Washington, D.C., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Texas.
 Before VAN GRAAFEILAND,* JOHNSON and JOLLY, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 Oscar Lindemann and Henry Klepak appeal from a judgment of the United States District Court for the Northern District of Texas, Dallas Division, which followed a nonjury trial before Judge Buchmeyer. The other named defendants are not parties to the appeal. The action against Lee Optical, Inc. was dismissed by stipulation. The Estate of Ellis Carp permitted judgment to be taken against it by default. Theodore Shanbaum withdrew his appeal from the judgment entered against him and the appealing defendants.
 
 
 2
 The factual setting for the litigation may be summarized briefly. In 1951, Lee Optical, Inc. created a Pension Plan and a Profit Sharing Plan. Dal-Tex, Inc., a wholly-owned subsidiary of Lee Optical, was a sponsoring employer of the Plans, which were non-contributory. Shanbaum and Carp were the principal shareholders of Lee Optical, and they served as trustees of the two Plans. Among the investments they made for the Pension Plan was the purchase of a one-third interest in Grayson Enterprises, Inc., the remaining two-thirds of which was owned by Shanbaum and Carp. In 1981, Grayson was dissolved, and its assets were transferred to a joint venture known as SCP which, as its name indicates, also was owned one-third each by Shanbaum, Carp and the Pension Plan.
 
 
 3
 In 1980, the then Secretary of Labor, Ray Marshall, sued Shanbaum, Carp, Lee Optical and Dal-Tex, alleging violations of ERISA, 29 U.S.C. Secs. 1001 et seq. Included among them were the making of improper loans by the Plans to the defendant companies and the failure to enforce payment of rent, claims and loans in default. Such actions by the Secretary are authorized by 29 U.S.C. Sec. 1132(a)(2). Henry Klepak, a 75-year-old Dallas attorney who had represented Shanbaum, Carp and Lee Optical for many years, represented the defendants in that litigation.
 
 
 4
 On September 24, 1981, the 1980 action was settled with the signing of a Consent Order by Judge Higginbotham. Under the terms of the order, Shanbaum, the sole surviving trustee of the Plans, was discharged, and the defendant Lindemann was appointed as his successor. The order also provided in substance that Dal-Tex would pay interest due and owing the Profit Sharing Plan in the amount of $102,406.31 and interest and principal due and owing the Pension Plan in the amount of $1,058,986.07. If Dal-Tex did not make the payments within six months, Shanbaum and Carp were to be held jointly and severally responsible for making them. Shanbaum and Carp were given the option of offering the new trustee property or other assets of equivalent value in lieu of cash, and the trustee was authorized to accept it if he determined that its value was equivalent to the amounts owed and the proposed transaction would be in the best interests of the Plans.
 
 
 5
 It quickly became obvious that Dal-Tex could not pay its obligations to the Plans, and the burden of making payment fell on Shanbaum and Carp. So far as can be determined from the record, the only asset of any substance which they could offer the new trustee was their two-thirds interest in SCP, which owned a radio station in Honolulu, Hawaii, and a microwave telecommunications system in Oklahoma and Texas. Within hours of his appointment as trustee, Lindemann agreed to accept Shanbaum's and Carp's two-thirds interest in these two properties in full satisfaction of their indebtedness. For purposes of the transfer, the radio station was assigned a value of $950,000, and the microwave system was given a value of $1,338,927. The value of Shanbaum's and Carp's two-thirds interest then was computed to be $1,525,951. Because the total amount due the two Plans under the Consent Order was $1,161,392.38, the parties calculated that there had been an overpayment of $364,558.96, and this amount was repaid by the Pension Plan to SCP. The Pension Plan also paid the Profit Sharing Plan the $102,406.31 that was owed to it. Lindemann agreed to the transfer and the calculations relying solely on Klepak's erroneous assurances that they had been approved by all parties to the Consent Order and the district court prior to Lindemann's appointment. Lindemann never saw an appraisal of either property before accepting the transfer and, of course, made no personal determination as to their value. This litigation followed.
 
 
 6
 Accepting appraisals submitted by the Secretary and rejecting those submitted by the defendants, the district court found that the property had been overvalued by $775,551.[1] The district court also found that the radio station and microwave system suffered operating losses of $347,514 during the first year of the Pension Plan's ownership. The district court held that because of Lindemann's "total abdication of fiduciary responsibility", he was liable for the overpayment and the operating losses but gave him a right of recovery over against Klepak. The court also held that both Shanbaum and Klepak were liable as knowing and active participants in Lindemann's breach of fiduciary duty. Judgment was entered against Lindemann, Shanbaum and Klepak for $2,083,628, of which $1,123,065 represented the total of the overvaluation and the operating losses and $960,563 represented prejudgment interest. The defendants also were required to make restitution in whole or in part for compensation they had received from the Plans. Other portions of the judgment are not of concern to us on this appeal.
 
 
 7
 The district court's decision to hold Klepak jointly liable with Lindemann, the named trustee, was correct and is affirmed. However, we reverse the district court's holding that Lindemann is entitled to complete indemnity against Klepak because of Klepak's "superior knowledge of the situation", because of "his role as an attorney", and because "as between the two of them, Klepak, rather than Lindemann, ought to discharge any liability to Plaintiff."
 
 
 8
 The ambiguous phrase "his role as an attorney" needs some explanatory factual background. The district court found that "shortly" after Lindemann's appointment as trustee, he "signed an agreement with Klepak, on behalf of the Plans, for Klepak to serve as their attorney." The district court also found that "on or about September 28, 1981, Lindemann authorized his own compensation as trustee at $3,000 per month", and "at the same time he set his own compensation", Lindemann hired Klepak as general counsel. The written "Employment Agreement", referred to by the district court, is dated September 28, 1981, and provides that the term of the Agreement is for a period beginning October 1, 1981 and terminating September 30, 1985.
 
 
 9
 Lindemann signed the agreement for transfer of the radio station and microwave system within hours of his appointment on September 24, 1981. Klepak had been the attorney for Shanbaum and Carp for many years and represented them in the litigation leading to the Consent Order. Our reading of the record satisfies us that he had not yet become the attorney for the Plans when the transfer agreement was signed on September 24, 1981. However, although Klepak was not a statutory fiduciary under 29 U.S.C. Secs. 1002(14)(A) and (21)(A), Yeseta v. Baima, 837 F.2d 380, 385 (9th Cir.1988), he was, as the district court held, jointly liable with Lindemann as a nonfiduciary who knowingly participated in a breach of trust. Brock v. Hendershott, 840 F.2d 339, 342 (6th Cir.1988); Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1220 (2d Cir.1987); Foltz v. U.S. News & World Report, Inc., 627 F.Supp. 1143, 1167-68 (D.D.C.1986); Donovan v. Daugherty, 550 F.Supp. 390, 410-11 (S.D.Ala.1982).
 
 
 10
 We reject Klepak's argument that his liability should be limited to the amount of his personal gain. Although there are some dicta in the cases to this effect, e.g., Fremont v. McGraw-Edison Co., 606 F.2d 752, 759 (7th Cir.1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980); McDougall v. Donovan, 539 F.Supp. 596, 599 n. 6 (N.D.Ill.1982); Donovan v. Daugherty, supra, 550 F.Supp. at 411, most courts that have considered the issue on the merits hold to the contrary, e.g., Foltz v. U.S. News & World Report, Inc., supra, 627 F.Supp. at 1167-68; Wisconsin Real Estate Investment Trust v. Weinstein, 509 F.Supp. 1289, 1299-1300 (E.D.Wis.1981); Heit v. Bixby, 276 F.Supp. 217, 230 (E.D.Mo.1967).
 
 
 11
 Having said that, we hasten to add that we see no basis for holding that Klepak should indemnify Lindemann, the named trustee, for Lindemann's liability arising out of his own blatant breach of trust. When Lindemann became trustee of the Pension Plan on September 24, 1981, he assumed rigorous obligations and duties, not only under general principles of law, Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570-74, 105 S.Ct. 2833, 2840-42, 86 L.Ed.2d 447 (1985), but also as specifically prescribed in Judge Higginbotham's Consent Order. The district court found that Lindemann acted in complete disregard of that order and in violation of sections 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. Secs. 1104(a)(1)(A) and (B), by acting imprudently and not solely in the interests of the Plans' participants and beneficiaries. The court also concluded that Lindemann made no independent investigation of the values of the properties or of their suitability as Plan investments before accepting them and that "[h]is utter reliance on the representations of those who have no expertise in the relevant field and who are not in a position to provide independent advice was not consistent with the responsibilities of a fiduciary."
 
 
 12
 We need not decide whether the scope of equitable relief available under 29 U.S.C. Sec. 1109 and general principles of trust law, which permit indemnification as between co-trustees where their fault is greatly disproportionate, see Free v. Briody, 732 F.2d 1331, 1336-38 (7th Cir.1984), authorize indemnification as between a trustee and a nonfiduciary participant. Such indemnification would not be proper here. In his role as trustee, Lindemann, a sophisticated businessman, owed the primary responsibility to the Plan. To say that he was derelict in the performance of his duties is to put it mildly. The benefits which ERISA was intended to achieve, and equitable principles as well, would be ill-served if trustees such as Lindemann could avoid all liability for their derelictions by transferring such liability to the shoulders of others who, at best, could only have participated in the trustees' wrongdoing. We conclude that the district court clearly erred in ordering such indemnification in the instant case. See Duckett v. National Mechanics' Bank, 86 Md. 400, 403, 38 A. 983, 984 (1897); Masonic Bldg. Corp. v. Carlsen, 128 Neb. 108, 131-32, 258 N.W. 44, 55 (1934).
 
 
 13
 Having determined the allocation of the Pension Plan's losses, we now consider the correctness of the amounts allowed. Trial of this action began on January 12, 1987 and concluded at 1:30 p.m. the following day. At the opening of the trial on January 12, counsel for the Secretary filed proposed Findings of Fact and Conclusions of Law. This is a prolix document, twenty-eight pages in length, which reads more like an opinion than what it purports to be. It even sets the prejudgment rate of interest to be charged on the recoveries it prescribes, i.e., the IRS adjusted prime rate set by the Secretary of the Treasury pursuant to 26 U.S.C. Sec. 6621. However, it contains no mention whatever of the financial status of Shanbaum and Carp, their lack of any assets other than the radio station and microwave system with which to make the payments required by the Consent Order. The district court's findings and conclusions, most of which are word for word those of the Secretary, see James v. Stockham Valves and Fittings Co., 559 F.2d 310, 314 n. 1 (5th Cir.1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978), likewise omit all reference to this evidence.
 
 
 14
 Examination of the record discloses that both Klepak and Shanbaum testified repeatedly that Shanbaum and Carp had no such assets. E.g.:
 
 
 15
 A. Well, Judge, I can tell you this: There were no other assets available of any kind or character. That is all we had to offer him. That is what we offered him and that's what he got.
 
 
 16
 Q. You've told me that several times before. (Klepak's examination by the court at 296)
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 I knew they were having trouble and I knew there wasn't a Chinaman's chance for them to ever get a dime out of Dal-Tex. I figured the only way Ted [Shanbaum] could pay and Carp could pay was ... by the conveyance of the only assets that they had. (Klepak's testimony at 266)
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 Q. Did you at the time that these properties were transferred have sufficient funds in your personal possession or assets in your possession other than your interest in the microwave system and the radio station that you could have transferred to the trust to comply with the terms of the Consent Order?
 
 
 23
 A. No, sir.
 
 
 24
 Q. To your knowledge did Dr. Carp?
 
 
 25
 A. No, sir.
 
 
 26
 Q. What about Dal-Tex?
 
 
 27
 A. Dal-Tex was in Chapter 11 bankruptcy. (Testimony of Shanbaum at 166)
 
 
 28
 This testimony is supported implicitly by the manner in which Shanbaum and Carp responded to the claims against them. Dr. Carp, and his estate following his death, failed to even interpose a defense, thus letting judgment be entered against them by default. Shanbaum failed to prosecute an appeal to this Court from the $2 million judgment entered against him. Shanbaum is appealing only the order permitting the Pension Plan to withhold his monthly payments, because, other than his social security, these payments constitute this over-70-year-old man's sole means of support. See Herberger v. Shanbaum, 853 F.2d 1307. This virtually undisputed evidence concerning lack of resources is crucially important.
 
 
 29
 Section 212, comment e, of the Restatement (Second) of Trusts provides that a "trustee is not liable for a loss resulting from the breach of trust if the same loss would have been incurred if he had committed no breach of trust." Put another way, "If the trustee commits a breach of trust and if a loss is incurred the trustee may not be chargeable with the amount of the loss if it would have occurred in the absence of a breach of trust." Id. Sec. 205, comment f. These comments find support in the cases. See, e.g., Shriners Hospitals for Crippled Children v. Gardiner, 152 Ariz. 519, 523, 733 P.2d 1102, 1106 (1986), vacated on other grounds, 152 Ariz. 527, 733 P.2d 1110 (1987); Fort Myers Memorial Gardens, Inc. v. Barnett, Banks Trust Co., 474 So.2d 1215, 1218 (Fla.App. 2d Dist.1985); Seven G. Ranching Co. v. Stewart Title & Trust, 128 Ariz. 590, 592, 627 P.2d 1088, 1090 (1981); Estate of Stetson, 463 Pa. 64, 83-84, 345 A.2d 679, 690 (1975). See also Bogert, Trusts and Estates Sec. 592 at 410-11 (2d ed. 1980 & Supp. 1988); Sec. 862 n. 10 (2d ed. 1982 & Supp. 1988); and III Scott, The Law of Trusts Sec. 205.1 at 1673 (3d ed. 1967).
 
 
 30
 The authorities are not in accord with regard to the burden of proof on the issue of causal relation. The cases cited in the preceding paragraph hold that, once the existence of a loss has been established, the burden is on the trustee to show that there was no causal relation between his breach and the loss, i.e., that the loss would have occurred regardless of the breach. However, there also is authority that it is the plaintiff's duty to prove a causal connection between the breach and the loss, particularly where the party sought to be held is not a named trustee. E.g., United States Life Ins. Co. v. Mechanics & Farmers Bank, 685 F.2d 887, 895-97 (4th Cir.1982); Leigh v. Engle, 727 F.2d 113, 137 (7th Cir.1984); Brandt v. Grounds, 687 F.2d 895, 898 (7th Cir.1982). Assuming that the burden of proof is on the defendants in the instant case, the record as it presently stands satisfies us that, except for the overpayment of $243,038[2] which the Pension Plan made to SCP, they have met this burden. Indeed, if other issues in the case did not require a remand in any event, we would be inclined to hold in favor of the defendants on this point without remanding to the district court for further findings. See Kratzer v. Capital Marine Supply, Inc., 645 F.2d 477, 483 (5th Cir.1981); Tomlin v. Ceres Corp., 507 F.2d 642, 648 n. 2 (5th Cir.1975); see also Canadian Transport Co. v. Irving Trust Co., 548 F.2d 53, 55 (2d Cir.1977).
 
 
 31
 Insofar as this item of damage is concerned, we direct that the district court on remand give the Secretary an opportunity to meet the defendants' proof concerning the lack of available assets and then make specific findings as to whether Shanbaum and Carp had any assets, other than the radio station and microwave system, that could have been used to satisfy Judge Higginbotham's Consent Order. If they had no other assets, the fact, as the district court found, that the two properties were transferred at an inflated value, did not harm the Pension Plan, except as the inflated values led to the $243,038 repayment. "If trustees act imprudently, but not dishonestly, they should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund." Brock v. Robbins, 830 F.2d 640, 647 (7th Cir.1987). Should the district court find that other assets were available for payment to the Plan, the damage figure of $243,038 may be increased by an amount representing such available assets until the total amount of the unpaid balance of the Consent Order has been reached.
 
 
 32
 We also are troubled by the district court's allowance of over $300,000 in operating losses. Both of the Secretary's appraisal experts used the cash flow method in evaluating the transferred properties. Using this method, the experts projected revenues, operating expenses, and capital expenditures some five or ten years into the future. These figures then were combined into a profit and loss statement to arrive at a net cash flow which was capitalized and discounted to arrive at the current cash value. See Matter of Valuation Proceedings, 531 F.Supp. 1191, 1225 (Regional Rail Reorg.Ct.1981). Once a current valuation was fixed by taking projected profits and losses into account, the Plan was not entitled to recover the discounted losses a second time.
 
 
 33
 Moreover, it is hornbook law that only such damages should be awarded as will place the injured party in the situation it would have occupied had the wrong not been committed. Albemarle Paper Co. v. Moody, 422 U.S. 405, 418-19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (quoting Wicker v. Hoppock, 6 Wall. 94, 99, 18 L.Ed. 752 (1867)); Freeport Sulphur Co. v. S/S Hermosa, 526 F.2d 300, 304 (5th Cir.1976). The law will not put the injured party in a better position. Missouri Pacific R.R. v. H. Rouw Co., 258 F.2d 445, 447 (5th Cir.1958), cert. denied, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959). The wrong asserted in the instant case was not the transfer of the properties--transfer was authorized in Judge Higginbotham's Consent Order--the wrongwas the excessive credit allowed for the properties. Had the properties been evaluated properly when they were transferred, the same operating losses would have occurred. To allow recovery for those losses, as the district court has done, is to place the Plan in a better position than it would have occupied had the wrong not occurred.
 
 
 34
 Finally, as a co-venturer in SCP, the Pension Plan would have been jointly and severally responsible for the liabilities inherent in the losses even if the radio station and microwave system had not been transferred. If, as defendants contend, Shanbaum and Carp were insolvent, the Plan, which then would have been the sole solvent owner, might have borne the burden of the losses in any event.
 
 
 35
 The last troublesome item which requires discussion is the prejudgment interest award which totals almost $1 million. Judge Higginbotham's Consent Order provided that, insofar as the $1,058,986.07 balance of principal and interest on the promissory note from Dal-Tex to the Pension Plan was concerned, "interest shall accrue on the unpaid balance at the rate of ten (10%) percent per annum from the date of entry of this Order until the date of final payment." However, as noted above, the Secretary's proposed Findings of Fact and Conclusions of Law included the following proposed "Additional Remedy":
 
 
 36
 In addition to the losses to the Plans for which the defendants are liable, the Court concludes that pre-judgment interest, based on the I.R.S. adjusted prime rate set by the Secretary of the Treasury, pursuant to 26 U.S.C. Sec. 6621, is appropriate in this case.
 
 
 37
 No evidence was offered as to why this rate was "appropriate", and the district court did not enlighten us. Its sole reference to the Secretary's proposal was "Also would accept the conclusion ... that prejudgment interest is recoverable on these claims." During most of 1982, the section 6621 rate was 20 percent simple interest, and after January 1, 1983 it began to be compounded at daily rates as high as 16 percent. Section 207 of the Restatement (Second) of Trusts provides that, as a general rule, a trustee will not be charged with compound interest unless he has received compound interest or profit equivalent thereto or it was his duty to accumulate income. The damage award exclusive of interest totaled $1,123,665. Interest at a flat rate of 10 percent from September 24, 1981 to the day of judgment, January 29, 1987, would have been approximately $598,559. The interest actually awarded totaled $960,563.
 
 
 38
 Absent statutory mandate, the award of prejudgment interest generally is discretionary with the trial court. Katsaros v. Cody, 744 F.2d 270, 281 (2d Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); Bricklayers' Pension Trust Fund v. Taiariol, 671 F.2d 988, 990 (6th Cir.1982). However, the somewhat cursory manner in which the district court accepted the Secretary's proposed "Additional Remedy" makes it difficult to weigh the propriety of the district court's exercise of discretion.
 
 
 39
 Prejudgment interest is not granted "according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness." Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962) (quoting Board of County Commissioners v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939)); see Huddleston v. Herman & MacLean, 640 F.2d 534, 560 (5th Cir.1981), aff'd in part and rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). It is not awarded as a penalty, but as compensation for the use of funds. Socony Mobil Oil Co. v. Texas Coastal and International, Inc., 559 F.2d 1008, 1014 (5th Cir.1977). There was no proof in the instant case that the Pension Plan was in the business of borrowing or lending money or that it paid or received any specified rate of interest. See Sabine Towing and Transportation Co. v. Zapata Ugland Drilling, Inc., 553 F.2d 489, 491 (5th Cir.), cert. denied, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977). There was no proof as to the rate of income it received on its investments. Neither Lindemann nor Klepak enjoyed the interest-free use of money belonging to the Pension Plan. See Pension Benefit Guaranty Corp. v. Greene, 570 F.Supp. 1483, 1503 (W.D.Pa. 1983), aff'd, 727 F.2d 1100 (3d Cir.), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984). If the instant case is appealed again to this Court following the remand we now order, we will be greatly assisted in reviewing the district court's discretionary allowance of section 6621 prejudgment interest if it is accompanied by a brief statement of reasons. See Sargeant v. Sharp, 579 F.2d 645, 647 (1st Cir.1978); Farmington Dowel Products Co. v. Forster Mfg. Co., 436 F.2d 699, 701 (1st Cir.1970).
 
 
 40
 Other contentions of appellants can be disposed of without discussion. Although Klepak was an elderly man in poor health and did not acquit himself well as a witness, the district judge who was in the best position to observe his demeanor did not abuse his discretion in refusing to grant Klepak's motion for a new trial. The refusal of the district court in a prior proceeding before Judge Fish to hold Lindemann, Shanbaum and Carp in contempt of court for failure to comply with Judge Higginbotham's Consent Order is not res judicata as to the claims asserted in the instant case. Indeed, this Court, in affirming Judge Fish's order, stated specifically that our affirmance should not be read to suggest that defendants might not be held liable for breach of duties under ERISA or for other reasons. The district court did not abuse its discretion in requiring Lindemann and Klepak to reimburse the Plans for compensation which they had received. III Scott, The Law of Trust Sec. 243 (3d ed. 1967). However, for the reasons above stated, Lindemann is not entitled to be indemnified by Klepak for the amount he repays.
 
 
 41
 Our disposition of the issues presented on this appeal is as follows:
 
 
 42
 1. We affirm that portion of the judgment below which holds Lindemann and Klepak jointly and severally liable for losses sustained by the Pension Plan and directs reimbursement of compensation received.
 
 
 43
 2. We reverse that portion of the judgment which gives Lindemann a right of recovery over against Klepak.
 
 
 44
 3. We vacate the damage award based on the property evaluations and remand to the district court for a determination as to whether Shanbaum and Carp had any assets other than the radio station and microwave system that could have been used to satisfy Judge Higginbotham's Consent Order. If they had none, the award of damages based on overvaluation of the properties must be reduced to $243,038. If the district court determines that other assets were available, the $243,038 figure may be increased by an amount representing the value of such assets until the unpaid balance of the amount due and owing under the Consent Order has been reached.
 
 
 45
 4. The award of $347,514 for operating losses is vacated.
 
 
 46
 5. If the district court again adopts the section 6621 prejudgment rate of interest, it should explain why it does so.
 
 
 47
 The remainder of appellants' arguments have been carefully considered, and they are rejected. The judgment is
 
 
 48
 AFFIRMED IN PART, REVERSED OR VACATED IN PART and REMANDED.
 
 
 
 *
 Circuit Judge of the Second Circuit, sitting by designation
 
 
 [1]
 Defendants' expert appraiser evaluated the radio station at $1,018,000, but the district court rejected this figure because the appraiser had not taken into account that a portion of the station's property was leased rather than owned and because the appraiser assumed a sale on "attractive terms". The district court also rejected defendants' $1,338,927 appraisal of the microwave system because it was made in 1979, two years prior to the transfer
 
 
 [2]
 Although the district court held that the Plan had made an overpayment of $364,558.96 to SCP, it apparently overlooked the fact that SCP was one-third owned by the Plan. The actual overpayment, therefore, should have been reduced by one-third to $243,038. It is conceded that Shanbaum took $125,000 of this amount for his personal use. Appellants contend, however, that the remainder was applied to the operating cost of the radio station while the parties were waiting for FCC approval of the transfer. The district court had no reason to hold that this vague assertion negated the Plan's claim of loss